UNITED STATES, Appellee

v

WILLIAM F. PETERSON, Sergeant,
U. S. Marine Corps, Appellant

15 USCMA 199, 35 CMR 171

———

*Lieutenant Colonel John R. DeBarr*, USMC, argued the cause for Appellant, Accused.

*Major Daniel F. McConnell*, USMC, argued the cause for Appellee, United States. With him on the brief was *Captain James A. Potter*, USN.

## Opinion of the Court

QUINN, Chief Judge:

Convicted by a general court-martial of two specifications of filing a false claim for a dislocation allowance and travel by his wife and two specifications of larceny of money obtained by means of the claims, in violation of Articles 132 and 121, respectively, Uniform Code of Military Justice, 10 USC §§ 932 and 921, the accused was sentenced to a bad-conduct discharge, confinement at hard labor for six months, and accessory punishment. The findings of guilty and the sentence were approved by the convening authority, with provision for suspension and remission of the discharge, and thereafter affirmed by a board of review. We granted further review to consider the sufficiency of the evidence to support the conviction.

The first claim for $166.50 was occasioned by the accused's transfer in 1960 from North Carolina to an overseas station in Japan. Travel regulations authorized the accused to select the place of residence within the United States for his dependents, during the period of his foreign duty. See Joint Travel Regulations For The Uniformed Services, paragraph 7005. A disbursing officer, an expert witness for the Government, testified there were no "restrictions on the home selected." The claim was filed in August 1960. In it, the accused represented that his residence was 3840 Fifth Avenue South, Minneapolis, Minnesota; and that between July 5 and July 8, 1960, his wife had traveled thereto from North Carolina. The address was that of the accused's father. The accused had lived there at the time of his enlistment in the Marine Corps in 1955, and it was the permanent address "carr[ied]" by him in his service record book. The second claim was for a dislocation allowance and dependent's travel from Minneapolis to Jacksonville, North Carolina. It was submitted in January 1962, after accused's reassignment to the United States.

To show the accused's wife had not performed the travel on either of the occasions certified in the claims, the prosecution introduced a number of Government allotment checks to her order. Several of these covered the period from June 30, 1960, to October 30, 1960. All were addressed to the accused's wife at Donalsonville, Georgia; and all bore endorsements of banks located in Jacksonville, North Carolina, and Donalsonville, Georgia. A second group of checks covered the period from October 30, 1961, to January 30, 1962. These checks were addressed to the accused's wife at Jacksonville; and they bore endorsements of banks in Jacksonville and in Berryville, Virginia. An emergency data form, executed by the accused in September 1960, listed the wife's residence at an address in Donalsonville, Georgia, corresponding to that on some of the allotment checks.

By deposition, the accused's father testified that in August 1960 he was in Pittsburgh, Pennsylvania, remodeling a home he owned in that city. He said the accused visited him there, but he did not meet Mrs. Peterson and he did not know whether she and the accused had stayed for any period of time at the Fifth Avenue home in Minneapolis. Similar deposition tes-

**201**

timony was given by the accused's sister, who also lived in Minneapolis.

At trial, the accused admitted that his wife's travel was not performed on the dates indicated in the claims. He testified that the first claim was based upon travel actually performed about August 8 or August 9, rather than July 5 through July 8. The second claim was also in error. He attributed the differences to the fact that, in determining the dates of travel on each occasion, he used the date on his transfer order as a point of reference, without giving "any technical thought whatsoever" to the actual days of travel.[1] However, he insisted that, in each instance, his wife had actually performed the travel to and from the cities indicated, for the purpose of establishing a *bona fide* family residence.

The accused's father-in-law, Elijah John Humphreys, testified in his behalf. He said Mrs. Peterson left North Carolina with the accused sometime in the summer of 1960. Thereafter, he received letters from her from Minnesota. He could not recall specifically how many he received, but there were "probably" more than one. Mrs. Bessie Robinson, a cousin of Mrs. Peterson who was "reared up" with her as a sister, also testified for the accused. She stated that about a month after Mrs. Peterson left North Carolina she received a money order from her from Minnesota.

The accused explained what transpired in Minneapolis. He said that instead of proceeding directly to his father's home, Mrs. Peterson insisted she "wanted to do something . . . on her own." She was a school teacher.

She told the accused she was "old enough to take care of herself," without supervision. Since she was determined "to prove something" in regard to their marital relationship, the accused agreed she could enroll in a summer course at the University of Minnesota, and reside for a time on campus. However, when his father returned from Pennsylvania, it was his "intention and expectation that she would utilize" the family residence as her home. His intention was not realized.

After he arrived at his overseas station, the accused received correspondence from Mrs. Peterson indicating she had left Minneapolis and returned to Donalsonville, Georgia, to accept a teaching appointment. He immediately went to the disbursing officer to apprise him of his wife's move. He was informed there was "no law that required a dependent" to stay a specified length of time at the residence indicated in the claim for travel and dislocation allowance. However, he advised "that when . . . [the accused] returned to the States . . . [he should] have her in Minnesota" to provide continuity in the chain of residences.

In April 1961, Mrs. Peterson gave birth to the accused's child at the Marine Corps Hospital at Camp Lejeune. At that time, the accused submitted another emergency data form in which he listed her actual place of residence as Donalsonville, Georgia. In September 1961, Mrs. Peterson accepted a teaching position in Berryville, Virginia.

On his reassignment to the United States, the accused arranged to have his wife meet him in Minneapolis, as

---

[1] The specifications allege, and the case was tried on the theory, that the travel was not in fact ▰▰▰▰ ▰ performed. Consequently, while the accused's admissions might perhaps constitute a judicial confession that he made and used a writing which he knew contained a false statement, in violation of Article 132(2), Uniform Code of Military Justice, 10 USC § 932, as to the offense charged, they are at best only evidence from which the court-martial might infer that, having misrepresented one particular of the claim, the accused might also have falsely recited the travel part of his certification. Cf. Manual for Courts-Martial, United States, 1951, Appendix 6c, Forms 106, 108, at pages 486–487. See United States v Wade, 14 USCMA 507, 34 CMR 287; United States v Phillips, 14 USCMA 620, 626, footnote 1, 34 CMR 400.

he had purportedly been advised to do by the disbursing officer in Japan. They proceeded immediately to Virginia, where they picked up the children at a place that Mrs. Peterson had left them, and then went to Jacksonville, North Carolina. On January 8, 1962, the accused filed the claim for dislocation allowance and dependent's travel from Minneapolis to Jacksonville. He was paid $183.12.

In October 1963, in a routine audit of travel claims, a representative of the General Accounting Office took exception to the payments and directed a "checkage" against the accused's pay. The accused's enlistment was due to expire on December 20. He had accepted a teaching position, and did not intend to reenlist. Consequently, on receipt of the notice of exception, he exercised the option tendered him to pay the total amount of the claims in a single payment. He made the payment on October 11. Nevertheless, about a week before his scheduled separation, formal charges were filed against him, and he was not released from the service.

For purposes of this appeal, we may assume, as Government counsel argue, that the Government's evidence alone could support a finding that Mrs. Peterson did not perform the travel indicated in the claims filed by the accused. See United States v Smith, 14 USCMA 405, 34 CMR 185. The Government's case, however, does not stand alone. Neither a trial court, nor an appellate court, is free to disregard, without reason, all the evidence presented by the defense. As early as United States v O'Neal, 1 USCMA 138, 147, 2 CMR 44, we observed that when this Court reviews the sufficiency of the evidence to establish guilt beyond a reasonable doubt it "should look largely at the case for the government, but . . . [we are] not required to ignore completely the bipartite nature" of a trial. We must, we said in another case, consider the "entire complex of evidence." United States v Peterson, 1 USCMA 317, 320, 3 CMR 51. See also United States v Brand, 10 USCMA 437, 28 CMR 3;

cf. United States v Swanson, 9 USCMA 711, 715, 26 CMR 491.

All the evidence for the Government is equally consistent with the defense account of the circumstances under which the claims were filed. As to the 1960 claim, the accused's testimony, which is substantially corroborated by that of his father-in-law and his wife's cousin, shows that Mrs. Peterson went to Minneapolis to establish a *bona fide* residence.

Enlargement of the rights of married women has not changed the rule that, under reasonable conditions, the husband, as head of the household, is entitled to determine the place of family residence. United States v Wooldridge, 10 USCMA 510, 514, 28 CMR 76. The accused admitted that Mrs. Peterson did not immediately reside at the place he designated for such residence. But, the allowance to her of a degree of self-expression by occupying a temporary residence in a place of her own choice, did not detract from the accused's authority or decision. Nothing in the record of trial, therefore, justifies disregard of the defense evidence that the accused made a *bona fide* choice of residence, and that his wife accomplished the travel to Minneapolis in response to that choice. Of course, the accused may have lied to the court-martial. So might his witnesses. But all the other evidence is consistent with their testimony. The Government's evidence does not exclude the reasonable explanation offered by the accused for the presence of the allotment checks in banks in North Carolina and Virginia at the times in issue. The place selected as the residence is the same as that from which the accused enlisted in the Marine Corps; and it belonged to his father. Consideration of all the evidence, therefore, leaves at least a reasonable doubt that the travel was not performed. The fact that Mrs. Peterson later left Minneapolis did not change the situation. In this regard, the advice of the disbursing officer was eminently correct. Mrs. Peter-

**203**

son's change of mind and location did not annul the accused's selection of the family residence and her travel to Minneapolis.

The limitation on Mrs. Peterson's power to determine the place of the family residence must also be considered in connection with the January 1962 claim for her travel and the dislocation allowance. Here, too, the Government's evidence is only to the effect that from about April 1961 to May 1962 she lived, at various times, in North Carolina and Virginia. The accused admitted that in his own testimony. He maintained, however, that, in accordance with the instructions he received from the disbursing officer in Japan, he made Mrs. Peterson meet him in Minneapolis. From there they both proceeded to Jacksonville, North Carolina, to establish the new family residence. Again, it is arguable that the accused merely lied to the court-martial, and his testimony should be disregarded. In fact,

the Government urges us to draw the conclusion the accused "certified to lies," from his admission that he misstated the dates on which the travel was performed by Mrs. Peterson, and that he falsely represented that his children accompanied him on the entire trip. The maxim, *Falsus in uno, falsus in omnibus*, has its place in assessment of the credibility of a witness; but like other evidentiary guides, its applicability and its weight depend upon the other evidence in the case. See Shecil v United States, 226 Fed 184, 187 (CA7th Cir) (1915). "All the evidence in this case so attenuates the inference" that at least a reasonable doubt of guilt remains. United States v Sluss, 14 USCMA 388, 391, 34 CMR 168.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside, and the charges are ordered dismissed.

Judges FERGUSON and KILDAY concur.