**Richard G. AUGENBLICK**

v.

**The UNITED STATES.**

**No. 357–64.**

United States Court of Claims.

May 12, 1967.

---

588

Joseph H. Sharlitt, Washington, D. C., attorney of record, for plaintiff, Donald H. Green, Fisher, Sharlitt, Gelband & Green, Washington, D. C., of counsel.

Edgar H. Twine, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant, Isaac D. Benkin, Washington, D. C., of counsel.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

DAVIS, Judge:

Our plaintiff is a career Navy commander, most recently on duty with the Department of Defense, who was dismissed from the service, with total forfeitures, by order of a Navy court-martial. Claiming that the conviction violated certain of his constitutional rights, he sues for back-pay and asks us to hold his dismissal invalid. The charge against him was sodomy with an enlisted airman, in violation of Article 125 of the Uniform Code of Military Justice, but the conviction was for the lesser included offense of committing an indecent, lewd, and lascivious act (under Article 134). The only sentence was dismissal and forfeiture of pay. Both sides have moved for summary judgment on the basis of the record in the military proceedings. We take the facts underlying the conviction as they were given by the Navy Board of Review in affirming the court-martial. Our problem concerns, not the weight or substantiality of the evidence, but alleged procedural defects said to constitute an invasion of the protection against double jeopardy and a denial of due process.

On January 11, 1961, Commander Augenblick, after having attended an office party where he had drinks of scotch with little water, proceeded to his home in Arlington, Virginia. Not feeling like turning in, he changed to civilian dress and went to a bar and an officers' club in Virginia before going to Washington where he also visited a bar. At each stop he had some beer. Becoming extremely tired and desiring a cup of coffee before returning home to Arlington, he entered a "White Tower" restaurant. While at the restaurant, he met Airman Hodges who was waiting for a bus which would return him to his base in nearby Maryland. It is not clear from the record who initiated the conversation, but it resulted in the accused's and the airman's taking a ride in the former's automobile. After driving about fifteen minutes, the accused parked the automobile in the vicinity of the West Potomac Basin in the District of Columbia, near the Potomac River, where they were apprehended by two Metropolitan Police Officers, taken to the Third Precinct, charged with disorderly conduct, and delivered over to military police.

The accused testified in his own behalf that he was driving toward the Fourteenth Street Bridge (over the Potomac River from the District of Columbia to Virginia); that he was very, very sleepy and felt that it was unsafe to drive and therefore stopped in the area mentioned and went to sleep; that the next thing he remembers is the glow from the flashlight of one of the arresting officers. Airman Hodges, who was in full military uniform at the time of the arrest, testified for the prosecution that Augenblick first informed him that he had his uncle's car and that they could go to his uncle's home for some rest; that refusing this offer, the airman went for a ride with the hope of being returned to his base. Hodges stated that, upon parking the automobile, the accused first reclined against his door; after a few minutes, he asked whether he could lay his head in Hodges' lap and after certain preliminaries the accused performed an act of oral sodomy. The arresting police officers testified that they noted the accused's head disappear from the driver's side of the vehicle and upon inspection found his face very close to the exposed privates of the airman. The court-mar-

tial found Augenblick not guilty of sodomy but guilty of committing an indecent, lewd, and lascivious act by willfully and knowingly placing his head in Hodges' lap with his face in close proximity to the latter's exposed privates.

The sentence of dismissal and forfeiture was approved by the convening authority, and the Board of Review (with one of its three members dissenting) affirmed. The Court of Military Appeals denied petitioner's request for review, and the Secretary of the Navy declined further review under Article 71 of the Uniform Code.

In this court plaintiff's claim is bottomed on two constitutional arguments. First, he asserts that his right not to be twice put in jeopardy was violated when his first court-martial was terminated and he was subsequently tried and convicted by a second court-martial. Second, he insists that rulings of the law officer at the trial and of the Board of Review, concerning the production of evidence relating to Hodges' early-morning interrogation at the Naval Weapons Plant in Washington, abridged his right to due process.

I

Here, as in prior back-pay cases involving court-martial proceedings, the defendant tells us that we have no jurisdiction to scrutinize the conviction. Rejecting a similar claim, we recently said that "our opinions have consistently stated or assumed that denial of significant constitutional rights would render the military conviction invalid, and permit this court to award back-pay." Shaw v. United States, 357 F.2d 949, 953, 174 Ct.Cl. 899, 904 (1966). It is argued that this position disregards Article 76 of the Uniform Code (and its predecessor, Article 50(h) of the 1948 Articles of War) providing that court-martial determinations "are final and conclusive" and "are binding upon all departments, *courts,* agencies, and officers of the United States * * *" (emphasis added).[1] The legislative history demonstrates conclusively that this section, despite the breadth of its wording, was not intended to do away with review by habeas corpus (S.Rep.No. 486, 81st Cong., 1st Sess. 32 (1949); H.R.Rep.No. 491, 81st Cong., 1st Sess. 35 (1949)), and the Supreme Court has twice held that military "finality" provisions of this type do not cut off review by habeas corpus. Gusik v. Schilder, 340 U.S. 128, 132–133, 71 S.Ct. 149, 95 L.Ed. 146 (1950); Burns v. Wilson, 346 U.S. 137, 142, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (opinion of Chief Justice Vinson).[2] Defendant takes strictly and literally this specific reference to habeas corpus and denies that any other

1. Article 76, 10 U.S.C. § 876 (1964), reads:

"*Finality of proceedings, findings, and sentences.* The appellate review of records of trial provided by this chapter, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter, and all dismissals and discharges carried into execution under sentences by courts-martial following approval, review, or affirmation as required by this chapter, are final and conclusive. Orders publishing the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon a petition for a new trial as provided in section 873 of this title (article 73) and to action by the Secretary concerned as provided in section 874 of this title (article 74), and the authority of the President."

2. There have been comparable Supreme Court rulings with respect to broad "finality" statutes in the selective service field (Estep v. United States, 327 U.S. 114, 119, 121–125, 66 S.Ct. 423, 90 L.Ed. 567 (1946)) as well as in immigration cases (Heikkila v. Barber, 345 U.S. 229, 233–235, 73 S.Ct. 603, 97 L.Ed. 972 (1953); Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955); Brownell v. Tom We Shung, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956)). See also Wellman v. Whittier, 104 U.S.App.D.C. 6, 259 F.2d 163 (1958) and Thompson v. Gleason, 317 F.2d 901, 115 U.S.App.D.C. 201 (C.A.D.C.1962) (interpreting 38 U.S.C. § 211(a), making final certain determinations of the Administrator of Veterans Affairs).

type of collateral review is available. But it seems clear that habeas corpus was mentioned because it is the primary mode of relief for confined prisoners, who historically form the bulk of those attacking court-martial convictions. For persons like plaintiff who are not in jail, habeas corpus is no remedy at all, and other avenues have long been open to redress their wrongs. In Gusik v. Schilder, supra, 340 U.S. at 133 n. 3, 71 S.Ct. at 152, the Court observed that "[c]ollateral attack of a judgment of a court-martial was early entertained", expressly citing civil actions for trespass, replevin, and assault, battery, and false imprisonment. During at least the past eighty years this court has entertained suits by military personnel claiming that their court-martial convictions were void. See, e. g., Runkle v. United States, 122 U.S. 543, 7 S.Ct. 1141, 30 L.Ed. 1167 (1887); Fletcher v. United States, 26 Ct.Cl. 541 (1891), rev'd on the merits, 148 U.S. 84, 13 S.Ct. 552, 37 L.Ed. 378 (1893); Swaim v. United States, 28 Ct.Cl. 173, 217 (1893), aff'd, Swaim v. U. S., 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897). This form of collateral review was long ago established firmly— although in the earlier days, of course, "jurisdiction" was interpreted narrowly. As the concept of "jurisdiction" has expanded (see, e. g., Johnston v. Zerbst, 304 U.S. 458 (1938)), this court has naturally kept pace. See Shaw v. United States, supra, 357 F.2d at 953–954, 174 Ct.Cl. at 903–906. The wider power of review has only been exercised for the last generation. There has, however, been an unbroken continuity, going back to the 19th century, in the position that a void court-martial conviction can be attacked through a suit for back-pay in this court. In one of his opinions in Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508,

346 U.S. 844, 847–848, 74 S.Ct. 3, 5, 98 L.Ed. 363 (1953), Mr. Justice Frankfurter referred to the broadened concept of "jurisdiction" reflected in a series of then-recent court-martial cases in the Court of Claims with the significant observation, "where of course collateral attack is by way of a petition for back pay resting on allegations that the assailed court-martial proceedings were void."

There is no adequate reason for looking to habeas corpus alone, or for thinking that Congress limited its exception from "finality" to that specific proceeding. Liberty is of course important, but so are a man's career,[3] his livelihood, his rights as a veteran, his status as a convicted criminal, and his reputation. To deny collateral attack to one not in confinement—the consequence of saying that habeas corpus is the only remedy—would be to deny the possibility of review by a constitutional court, and ultimately by the Supreme Court, of the constitutional claims of servicemen like plaintiff who have not been sentenced to jail or who have been released. See Gallagher v. Quinn, 124 U.S.App.D.C. 172, 363 F.2d 301, 303–304 (1966), cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108. On these grounds, the District of Columbia Circuit recently upheld, in *Gallagher*, the right to seek a mandatory injunction and declaratory relief testing a court-martial conviction, and the First Circuit has sustained an action in the nature of mandamus to the same effect. Ashe v. McNamara, 355 F.2d 277 (C.A. 1, 1965).[4] Within the last three years we have taken the same road in Hooper v. United States, 326 F.2d 982, 164 Ct.Cl. 151 (1964), cert. denied, 377 U.S. 977, 84 S.Ct. 1882, 12 L.Ed.2d 746, and in Shaw v. United States, supra (as well as in earlier decisions).

---

3. Plaintiff had served over 18 years in the Navy at the time of his conviction, with combat service in World War II and the Korean episode, and important duty assignments; he had been selected for promotion to captain.

4. The other day the District of Columbia Circuit entertained a declaratory judg-

ment suit by an individual who had been convicted and fined by a court of the civil administration of Okinawa, from which no direct appeal can be taken to any Article III court. Rose v. McNamara, D.C.Cir., 375 F.2d 923, decided March 23, 1967.

 Defendant points out that here, unlike *Shaw* (see 357 F.2d at 954, 174 Ct. Cl. at 905–906), the Court of Military Appeals could have reviewed the case, though it chose not to do so. On the pure question of this court's power to consider the "jurisdiction" of the court-martial, we do not think this makes any difference. The "finality" provision of the Uniform Code, as we have pointed out, does not make the military appellate court truly final. Appropriate review by Article III courts has continued. In Hooper v. United States, supra, the Court of Military Appeals had taken the plaintiff's case and passed upon the same issue presented to this court. In Gallagher v. Quinn, supra, as in the present case, the Court of Military Appeals denied the petition for review. In several habeas corpus cases the Supreme Court has considered issues which have been passed upon by the military court. Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); Kinsella v. U. S. ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); McElroy v. U. S. ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed. 2d 282 (1960). These cases involved court-martial "jurisdiction" in the more traditional sense, but once it is admitted that this court (or a district court) still has power to consider that kind of "jurisdiction"—even after the establishment of the Court of Military Appeals—we do not see how it can be said that the civil court's *power* is restricted to old-fashioned "jurisdiction" and cannot extend to "jurisdiction" in the more modern sense of Johnston v. Zerbst, supra. It may well be that, where the Court of Military Appeals has actually passed upon factual issues, a civil court should not reweigh the evidence at all. But lesser deference may be thought due where the Court of Military Appeals, as here, has merely denied a petition for review, thus exercising the certiorari-type authority

granted it by Article 67(b) (3) of the Uniform Code.[5] Cf. Fay v. Noia, 372 U.S. 391, 435–438, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). In any event, the existence of the Court of Military Appeals does not preclude consideration by this court of constitutional issues other than those calling for a reassessment of particular evidence or particular circumstances. See Shaw v. United States, supra, 357 F.2d at 954, 174 Ct.Cl. at 905.

 It is for that reason that we cannot accept, in this case, the Government's further point that, since plaintiff was accorded consideration within the military system of the constitutional objections he now advances, this court should not reconsider those objections for itself. As will appear in our discussion of the merits (Parts II—V, infra), there is no occasion now (as there was not in *Shaw*) to consider whether or not the admonitions of Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), have retained their full force since the recent developments in the law of federal review of state criminal convictions (e. g., Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)). To dispose of this case we need not reevaluate for ourselves evidence which the military has itself evaluated under a proper legal standard. We need not reexamine or reweigh pure issues of fact. The errors we find mount to a constitutional defect which grows directly from, and is entwined with, erroneous legal rulings by the law officer and the Board of Review. In that respect the requirement of Burns v. Wilson, supra,, 346 U.S. at 142, 144, 73 S.Ct. 1045, for full and fair consideration of the case by the military has not been fulfilled for this plaintiff.

## II

 The claim of double jeopardy rises from these facts:—Under court-martial procedures, if a witness is not

---

5. In the decisions in which we have referred to a denial of a petition for review by the Court of Military Appeals, we have also found, ourselves, no reason to think there was a jurisdictional defect (Moses v. United States, 137 Ct.Cl. 374, 379–380 (1957); Begalke v. United States, 286 F.2d 606, 609–610, 148 Ct.Cl. 397, 402–403 (1960), cert. denied, 364 U.S. 865, 81 S.Ct. 108, 5 L.Ed.2d 87).

**594**

available for examination during the required pre-trial investigation (under Article 32) it is prejudicial error for the investigating officer to consider his unsworn statements. Failure to follow this procedure could subject subsequent findings by a court-martial to reversal on appeal. United States v. Samuels, 27 C.M. R. 280, 287 (1959). At plaintiff's pretrial investigation, written documents purporting to be sworn statements of the two arresting police officers were introduced in the absence of those civilian officials who had refused to testify unless subpoenaed. Agent Mendelson, a civilian employee of the Office of Naval Intelligence (who took the statements), testified at the investigation that the statements had been sworn to (and therefore that the jurats were correct). The accused objected to the officers' evidence, claiming that he should have been permitted to confront and examine them. The investigating officer ruled otherwise, and on the basis of the allegedly sworn statements and the testimony of Airman Hodges recommended that Commander Augenblick be brought to trial before a general court-martial. At the first trial, the defense counsel renewed the objection to the appearance of the police officers and moved that the charge and specification be dismissed on the ground that their pre-trial statements had not been shown to be sworn, as required by the Code. During an interview with defense counsel and at an out-of-court hearing, one police officer categorically stated that he had not sworn to his written statement. Mendelson testified that he was not certain but felt that he had taken the officer's oath. Confronted with this conflicting testimony, the law officer, presiding at the trial, interpreted the defense motion to dismiss as one for appropriate relief and granted it. He also considered it within the province of the convening authority to determine what disposition should be made of this matter and what action should be taken on the charge and specification. The convening authority withdrew the charge and specification from the first court and initiated

a Court of Inquiry which heard sworn testimony, including that of the police officers, and recommended a second court-martial. This second trial, before a new court, is said to have violated plaintiff's constitutional right to be free of double jeopardy.

 The Fifth Amendment "does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment." Wade v. Hunter, 336 U.S. 684, 688, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961). Aware that unforeseeable circumstances may arise during a trial making its completion impossible, the Supreme Court has long applied the rule, first formulated in United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), that "a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice." Wade v. Hunter, supra, 336 U.S. at 690, 69 S.Ct. at 838. *Perez* and its progeny, instead of establishing a "rigid formula" capable of mechanical application, direct the courts to pay heed to all circumstances and to accept "the sound discretion of a presiding judge * * * as to the necessity of discontinuing a trial." 336 U.S. at 691, 692, 69 S.Ct. at 838. This same standard applies, in general, to courts-martial. Wade v. Hunter, supra; United States v. Stringer, 17 C.M.R. 122, 132–33 (1954).

 In this case, the law officer was confronted—when it was learned that the policeman had not in fact sworn to his pre-trial statement—with potential procedural error of sufficient gravity to vitiate an ultimate finding of guilty. Cf. United States v. Schilling, 22 C.M.R. 272, 274 (1957). The steps taken by him and the convening authority to cure this serious defect were well within the bounds of sound judgment. An error in the pretrial investigation might possibly be cured by testimony received at the trial. See, e. g., United States v. Everett, 16

C.M.R. 676 (1953). That was, however, not the only route. The course chosen was quite appropriate since the observations in the policeman's pre-trial statement had contributed to the investigating officer's recommendation that a court-martial be convened. In those circumstances it was important to determine if sufficient evidence existed, apart from the questionable statement, to bring the accused to trial. One method of obtaining this evidence would be to convene a Court of Inquiry which would have the authority (which the Article 32 pre-trial investigation lacked) to subpoena witnesses, including the policemen, hear testimony, and recommend any additional judicial proceedings.[6]

Our conclusion is supported by the significant fact that in the first court-martial proceeding the accused apparently sought the very remedy provided by the convening authority—the establishment of a Court of Inquiry. In military procedure, a motion to dismiss is often treated as a motion for appropriate relief. See United States v. Samuels, supra; United States v. Nichols, 23 C.M.R. 343, 348 (1957); United States v. Everett, supra. Here, defense counsel did not object to the law officer's ruling converting the motion to dismiss into one for appropriate relief. On the contrary, counsel, by motions and argument, indicated that they sought the opportunity to interrogate the policeman at a Court of Inquiry, and pointedly declared that "very definitely we would ask for a court of inquiry." [7] The plaintiff cannot insist upon specific redress before the court-martial and then complain because it was granted. See United States v. Ivory, 26 C.M.R. 296 (1958); Leigh v. United States, 329 F.2d 883, 884, 117 U.S.App. D.C. 315 (C.A.D.C. 1964).

Nor is there adequate reason to believe that the convening authority terminated the proceedings and ordered the Court of Inquiry with the intention of obtaining the accused's conviction by a second court-martial after it had become evident that the first would acquit. The Board of Review (which was unanimous on the double jeopardy issue) found that

---

6. We agree with the statement of the Board of Review that, "There were other means at the disposal of the law officer and the convening authority to clarify this issue and remedy the defect but we do not believe it is for us to be a 'Monday morning quarterback' in this particular instance since we see nothing here that would lead us to believe that the action taken by the law officer and the convening authority was for any purpose other than to cure a defect and assure the parties a fair and impartial trial."

7. The record of the pre-trial investigation and the first court-martial reflects counsel's insistence. At the outset of the first Article 32 pre-trial investigation, the defense objected to proceeding in the absence of the two police officers who would not appear unless subpoenaed. Defense counsel stated, "There is a procedure in existence for securing their presence." During the first trial, counsel renewed this objection and moved that the charge and specification be dismissed, stating in part:

"Those policemen were readily available by processes of the Navy with which the Legal Officer was completely aware, namely, that a Court of Inquiry, which would have subpoena power, could be employed * * *."

In further argument on the motion for dismissal, the defense counsel stated:

"I believe and I submit to the law officer, that I don't think I could have made it any clearer right at the very outset that we've not only objected, but without using the words 'Court of Inquiry' as such, which I say again, I don't think was necessary; the Investigating Officer, the Commander, the Legal Officer, he knew what I meant without using the touch stone, Court of Inquiry, but we were told that this is the proceedings, this is the way we are going to proceed and that's it."

Finally, in response to the law officer's question at the trial whether the defense desired a further pre-trial investigation or a Court of Inquiry to be held to correct the alleged defects in the pre-trial investigation, the defense stated:

"Yes, sir. * * * The answer to the law officer's question is that very definitely we would ask for a court of inquiry. That was what we had meant by implication at the very beginning sir."

evidence very damaging to the accused had already been received by the first court through Hodges' testimony. That trial, when terminated, was not going badly for the prosecution. See Gori v. United States, supra, 367 U.S. at 369, 81 S.Ct. 1523. Indeed, there is evidence that the president and members of the first court-martial were "irritated" by the "administrative delays" (caused by the lengthy out-of-court hearings), and that the accused's counsel was concerned with the possibility that these irritations might affect the court's judgment adversely to the accused. If such prejudice were established, dismissal of the charge and specification and granting of a retrial would be the required procedure. Wade v. Hunter, supra, 336 U.S. at 689, 69 S.Ct. 834. This possibility could be taken into account in confirming the decision to terminate on other grounds.

The course taken by the law officer and the convening authority was an effort to assure the accused a fair and impartial trial. Confronted with serious procedural error and aware of the expressed desire of accused's counsel, the officials chose to end the first court-martial, convene a Court of Inquiry, and proceed to trial anew. There was no taint of an attempt to prejudice the accused. In the circumstances, we agree with the Board of Review that these measures did not violate the double jeopardy provision of the Constitution.

### III

The second of plaintiff's bases for invalidating his conviction and dismissal is that rulings of the law officer (at the second court-martial) and of the Board of Review violated the Jencks Act, 18 U.S.C. § 3500, and that in this case those errors rose to a deprivation of due process.

The challenged rulings involve the early-morning interrogation of Airman Hodges immediately after the arrest. At the civilian police station, both the commander and the airman denied that "anything" had happened. After being turned over to the Armed Services Police, they were brought to the headquarters of the Potomac River Naval Command at the Naval Weapons Plant in Washington for interrogation. It was then about three o'clock in the morning of January 12, 1961. The airman and the accused were questioned separately in a room designed for the monitoring and recording of conversation. Agent Connor of the Office of Special Investigation of the Air Force (OSI) interrogated Hodges, while Agent Mendelson, the civilian employee of the Office of Naval Intelligence (ONI), observed, asked some questions, and took notes. After twenty to twenty-five minutes Connor accompanied the twenty-year old Hodges to the separate Air Force OSI headquarters in Maryland where Hodges swore to a five-page written statement describing the evening's events. After the Hodges session at the naval station, Mendelson interrogated the accused for about two hours. During both interviews at the naval station, Agent James, the duty officer at that post, was in the adjacent room. He testified unequivocally that he had made tape recordings of both sessions—one reel of the Hodges and two reels of the Augenblick interrogation.

At the second court-martial, Hodges' testimony touched on his interrogation at the Naval Weapons Plant. After trial counsel's direct examination, the defense moved, pursuant to the Jencks Act, for production of the tape recording transcribed by Agent James and for the handwritten notes taken by Agent Mendelson during the interrogation. The law officer ordered either that the tape-recording be produced or that the Government produce witnesses at an out-of-court hearing who "can explain" its non-existence if the tape were not available, but refused to order production of Mendelson's notes.[8] The Government did not produce the Hodges tape-recording, but called as wit-

---

8. The prosecution had proffered Hodges' written statement made later at Air Force headquarters, but the defense had declined the offer.

nesses each of the intelligence officers who had contact with the recording, except Agent Mendelson who was in Norfolk at the time of the second trial in Washington. The upshot of the testimony was that, though James testified that he had made the tape, no one then had it or had heard it or knew what had happened to it. The defense urged the calling of Mendelson but the law officer, after reading the record of Mendelson's testimony on the tape-recording at a pretrial investigation, refused to have him called as a witness and concluded that no sanction should be imposed on the prosecution for failing to produce the recording. The Board of Review (with a dissent on this point) affirmed, holding, among other things, that "It was the responsibility of counsel for defendants, [sic] to pursue ascertainment of correctness of the Government's claim that the tape recording which was demanded for production is no longer in existence, and for no reprehensible reason chargeable to the Government."

A. We discuss first the application of the Jencks Act to the tape-recording, then to the handwritten notes (Part IV, infra), and finally, in Part V, infra, whether the circumstances here raise the statutory violations to the constitutional level. The Act provides that, after a Government witness has testified on direct examination at a criminal trial, "the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Paragraph (d) declares:

If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

■■ The Hodges tape-recording would plainly qualify as a producible statement under paragraph (e).[9] There is no doubt, moreover, that the Jencks Act governed plaintiff's trial. See United States v. Combs, 28 C.M.R. 866 (1959); United States v. Heinel, 26 C. M.R. 39 (1958). The rights protected by both the Supreme Court's *Jencks* decision, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed. 2d 1103 (1957), and the congressional Act are considered by the military as "a basic protection to which an accused is entitled." Kent, "The Jencks Case: The Viewpoint of a Military Lawyer," 45 A. B.A.J. 819 (1959), citing Dep't of Army Pamphlet 145–1 at p. 37. In this case, the Government has accepted the applicability of the Jencks Act to proceedings of military tribunals and has confined its argument to denying any statutory violation or invasion of constitutional rights.

■ Three other undisputed postulates of the Act's application may also be stated at the outset. First, a "statement" need not be within the physical control of the prosecution to be "in the possession of the United States." It is sufficient that an investigating Government official has possession. The original *Jencks* decision, supra, 353 U.S. at 659, 673, 77 S.Ct. 1007, as well as the majority of its offspring, have involved the production of reports from the files of the FBI. Cf. Harvey Alum. (Inc.) v.

---

9. 18 U.S.C. § 3500(e) provides:
"The term 'statement', as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—
"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

NLRB, 335 F.2d 749, 753–754 (C.A.9, 1964) (statements held by government agency other than the one conducting a hearing producible under Jencks Act at the hearing). Even in non-Jencks Act evidence-suppression cases, the activities of investigating officials are generally attributed to the prosecution. See Barbee v. Warden, 331 F.2d 842, 846 (C.A.4, 1964); Curran v. State of Delaware, 154 F.Supp. 27, 31 (D.Del.1957, aff'd, 259 F. 2d 707 (C.A.3, 1958), cert. denied, 358 U. S. 948, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959). Possession of the tape recording by a Government official such as an ONI or OSI intelligence officer would thus fall within the statutory requirement. Equally evident, destruction of a statement, in certain circumstances, would be the equivalent of nonproduction under section 3500(d). Campbell v. United States, 365 U.S. 85, 98, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); Killian v. United States, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961). Restricting "possession" to physical control at the time of trial would "permit evasion and emasculation of the Jencks Act to the point of total ineffectiveness." United States v. Lonardo, 350 F.2d 523, 530 (C.A.6, 1965). Third, the test to determine in what circumstances a Government official may destroy a Jencks Act "statement" without violating the statute turns on the good-faith and reasonable nature of the destruction. For instance, an FBI agent takes notes of an interview with a Government witness, and, after transferring the information in the notes to a formal report, destroys the former. Assuming the notes to be a statement, the Supreme Court has indicated that the critical inquiry would be whether the statement was "destroyed by the agents in good faith and in accord with their normal practice * *· *."

Killian v. United States, supra, 368 U.S. at 242, 82 S.Ct. at 308.[10] The federal courts have carefully examined the particular facts of each case in reaching this judgment. See United States v. Jones, 360 F.2d 92, 95 (C.A.2, 1966), cert. denied, 385 U.S. 1012, 87 S.Ct. 721, 17 L. Ed.2d 549 (1967); United States v. Greco, 298 F.2d 247, 250 (C.A.2, 1962), cert. denied, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785, and the other cases cited infra.

■ B. A crucial and contested issue in this case is whether the Government must demonstrate compliance with the good-faith test or whether the accused must show noncompliance (i. e. bad faith or willful destruction). This issue has rarely been discussed directly but we think that the cases indicate that the responsibility rests predominantly on the Government to prove that an unavailable statement was destroyed or misplaced in good faith, once the accused has made a showing that there is a sufficient basis for inquiry.[11]

■ At plaintiff's trial there was clearly enough of a showing to call for a further inquiry into the then existence of the Hodges tape-recording—the pretrial testimony of Agent James that he had made such a tape would be sufficient in itself, and there were other troubling circumstances. The law officer obviously felt that plaintiff had borne any burden of coming forward; he ordered an out-of-court inquiry. Once that stage was reached, the standard advanced by the Supreme Court in *Killian*, supra—whether the statement was "destroyed by the agents in good faith and in accord with their normal practice. * *" —suggests that the Government must convince the judge of these facts. The references in Campbell v. United States,

---

10. In Campbell v. United States, supra, 365 U.S. at 98, 81 S.Ct. 421, the Court left open the further question whether mere negligent destruction (or even non-negligent good-faith destruction) would be enough to invoke the Act's sanctions against the Government. See footnote 14, infra.

11. On the accused's burden of going forward, see United States v. Comulada, 340 F.2d 449, 451 (C.A.2, 1965), cert. denied, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272; Alexander v. United States, 118 U.S.App.D.C. 406, 336 F.2d 910, 911–912 (1964), cert. denied, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 346.

supra, 365 U.S. at 95, 81 S.Ct. at 427, to a Jencks Act inquiry not being "an adversary proceeding in the nature of a trial controlled by rules governing the allocation between the parties of the burdens of proof or persuasion" was not intended to remove from the Government the risk of failing to persuade that it acted in good faith; rather, the Court was cautioning against imposing such burdens on the accused.

■■■■ The federal courts seem to have applied the rule in this fashion. In Ogden v. United States, 303 F.2d 724, 737–738 (C.A.9, 1962), the court stated that during a Jencks Act inquiry the judge should consider evidence bearing on the issues "if the statement was destroyed in accordance with normal practice before the prosecution of defendant was contemplated, for a sufficient reason wholly unrelated to the prosecution, in good faith and with no intention to suppress evidence," and these facts are "peculiarly within the knowledge of the government, and it was improper to impose the burden of a more precise demonstration upon the defendant." See also United States v. Hilbrich, 232 F.Supp. 111, 115, 130 (N.D.Ill.1964), aff'd 341 F.2d 555 (C.A.7, 1965), cert. denied, 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704 (Government introduced evidence to show that statement destroyed in accordance with FBI procedures, good business and office practice. In judging the Government's good faith, the most important evidence "is the testimony of the witness who caused the destruction—his character and his apparent motives."); United States v. Crosby, 294 F.2d 928, 950–951 (C.A.2, 1961), cert. denied sub nom. Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962) (finding of good-faith destruction made after Government prosecutors who had destroyed certain notes testified); United States v. Tomaiolo, 317 F.2d 324, 327–328 (C.A.2, 1963), cert. denied, 375 U.S. 856, 84 S.Ct. 119, 11 L.Ed.2d 83 (finding of good-faith destruction made after Government showed that notes were destroyed prior to the passage of the Jencks Act and the identical information was available by other Government-furnished statements); United States v. Thomas, 282 F.2d 191, 193–194 (C.A.2, 1960) (good-faith destruction found after detailed explanation of government procedure regarding the preparation of written reports from destroyed notes); United States v. Lonardo, supra, 350 F.2d at 529–530, 535 (Government unable to demonstrate good-faith destruction; statutory sanctions invoked although the defense apparently had not affirmatively shown any governmental intention to suppress information).[12] When a demonstration of good-faith behavior is affirmatively made by the Government, the accused would be called upon to rebut this evidence if he wished to prevail. See United States v. Greco, supra, 298 F.2d at 250.

Placing the burden on the Government is just and appropriate. "[T]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." Campbell v. United States, supra, 365

---

12. Chief Judge Woodbury of the First Circuit has stated, while not affirmatively holding, what might possibly be interpreted as a contrary rule. On a petition for rehearing in the *Campbell* case, it was said that the Jencks Act imposes "no duty, at least in the absence of bad faith, to keep any statements that might have been taken. Therefore, there being no evidence from which it could possibly be found that Toomey [the Government agent] destroyed his notes in bad faith, the question propounded by this petition * * * is academic." Campbell v. United States, 303 F.2d 747, 751 (1962). We think that this statement only places the burden on the accused, to show official bad faith, after the Government has proffered evidence demonstrating that the "destruction was in entire good faith." This is consistent with both the concurring judge's interpretation of the court's denial, id. at 752, and the court's earlier disposition of the same case. 296 F.2d 527, 534 (1961).

U.S. at 96, 81 S.Ct. at 427; United States v. New York, N.H. & H. R.R., 355 U.S. 253, 256 n. 5. On the other hand, to put this burden on the Government would not cause unfairness or hardship. Tot v. United States, 319 U.S. 463, 469–470, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); Shaw v. United States, supra, 174 Ct.Cl. at 916, 357 F.2d at 960–961. Facts bearing on the issue, such as the agents' conduct, office operating procedure, the existence of other evidence which might provide the accused with the information contained in the missing statement, are all "peculiarly within the knowledge of the government * * *." Ogden v. United States, supra, 303 F.2d at 737.

■ We hold, therefore, that the Board of Review erred as a matter of law in ruling that "it was the responsibility of counsel for defendants, [sic] to pursue ascertainment of correctness of the Government's claim that the tape recording which was demanded for production is no longer in existence, and for no reprehensible reason chargeable to the Government." [13] That holding improperly placed the burden of persuasion on the accused.

C. This erroneous ruling directly infected, in our view, the Board's affirmance of the law officer's refusal to order Agent Mendelson called to testify at the production hearing held during the second trial. The law officer reasoned that Mendelson need not be called since he had testified during a pre-trial investigation (the "Peltzer investigation"), the defense had an opportunity to cross-examine him at that time, and Mendelson was then in Norfolk and a trip to Washington would have caused delay. The law officer read the relevant portions of the "Peltzer investigation" transcript and concluded that further testimony by Mendelson would not shed additional light on the disposition of the missing recording.

■ We know, of course, that evidentiary rulings are generally within the province of the trier and a judge or law officer's judgment should not be altered unless it is clearly erroneous. Palermo v. United States, 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). But the main basis for this rule, that the trial judge has had the opportunity to weigh the credibility of live testimony presented before him, is absent in this case—the fact that Mendelson did not appear before the law officer is the critical point. See United States v. Aviles, 337 F.2d 552, 556 (C.A.2, 1964). Moreover, this rule cannot and has not deterred courts from reviewing and reversing decisions which contravene substantial rights. See Jencks v. United States, supra, 353 U.S. 657, 77 S.Ct. 1007; Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963). We think that such an error is present here.

■ In Jencks Act matters the judge (and the law officer at a court-martial) has a special responsibility, and is not merely a passive arbiter of the parties' contentions. The Supreme Court stated in *Campbell I*, supra, that the judge's duty at a hearing is "affirmatively to administer the statute in such way as can best secure relevant and available evidence * * *." 365 U.S. at 95, 81 S.Ct. at 427. The hearing is not a strictly adversary proceeding. The

13. The Board majority also indicated by its phrasing that it was putting the burden on the accused when it said, in the paragraph immediately preceding the portion quoted above in the text, "nor is there any evidence of destruction or bad faith or deliberate refusal to produce, as suggested by appellant in his supplemental brief," and "All of the witnesses were under oath and we cannot without substantial evidence to the contrary, hold that there was a deliberate refusal to deliver the tape or that these government employees were guilty of gross negligence of a degree requiring corrective action on our part." If the tape was improperly destroyed, Mendelson probably did it, but the Board merely says there was no evidence to that effect. That position reverses the burden. The Government should have been required to prove that Mendelson did not destroy the record.

Court indicated, for example, that the trial judge might be required to call a witness on his own motion or require the Government to produce a witness to clarify uncertainties. The aim is to insure that the judicial officer is able to obtain sufficient information to determine whether the conditions of the Jencks Act have been fulfilled. See Saunders v. United States, 114 U.S.App.D.C. 345, 316 F.2d 346, 349 (1963); Hilliard v. United States, 115 U.S.App.D.C. 86, 317 F.2d 150, 151 (1963); Ogden v. United States, 323 F.2d 818, 821 (C.A.9, 1963), cert. denied, 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964).

■ In the light of the judicial officer's special responsibility, the mere reading of Agent Mendelson's prior testimony cannot, in the circumstances of this case, be accepted as sufficient. The cold print of a transcript is not as revealing as the opportunity to see, hear, and question a witness, and thus better judge his credibility. The law officer's inquiry was limited to the issues raised and the responses given at another investigation. He was denied the opportunity to raise new questions, press additional contentions, or reflect upon the witness' behavior or demeanor. Such advantages of oral testimony over the reading of a transcript caused the First Circuit to send a Jencks Act case back to the trial judge, ordering him to take oral testimony of a key government agent. Campbell v. United States, supra, 296 F.2d at 534. See also, Campbell v. United States, supra, 365 U.S. at 96, 81 S.Ct. 421; Campbell v. United States, supra, 373 U.S. at 493, 83 S.Ct. 1356. In the present instance, the witness' (Mendelson's) credibility was of obvious importance. It had already been placed in question by Mendelson's testimony that he had taken a sworn statement, with a jurat affixed, from Police Officer Round (one of two civilian policemen who had made the arrest); Round denied under oath that he ever swore to the statement; and the subsequent testimony of both policemen was "somewhat weaker" than their purportedly sworn statements.

In addition, Mendelson's testimony during the "Peltzer investigation" was far from informative on the two issues of importance at the out-of-court hearing during the second court-martial. First, when asked whether Hodges' interrogation had been recorded, the agent replied, "I'm not certain that we had any recording." Second, regarding the whereabouts of a tape if one had been made, he said: "I don't recall receiving a tape with Hodges' recording on it." He also offered the explanation that if he had received such a tape, "when the statement from Hodges came in, the tape was reused for another investigation."

Other testimony received during the pre-trial investigations and at the out-of-court hearing in the second court-martial clarified several issues and also raised serious questions regarding Mendelson's answers. Agent James unequivocally stated that he had made a recording (one reel) of the Hodges interrogation and had delivered that reel, with two others of Commander Augenblick's interrogation, to Agent Fason, Mendelson's superior. Mendelson's answer on the making of a tape was thus flatly contradicted by the person most likely to know. The helpfulness of Mendelson's initial statements on the disposition of the recording was also placed in grave doubt. Fason had originally testified that he had not received the reels from James. After Mendelson's appearance at the "Peltzer investigation", however, Fason altered his testimony and remembered receiving boxes of tapes from James and physically handing the boxes (with a rubber band around them) to Mendelson on January 12, 1961. This change of testimony, after Mendelson's testimony, might have reawakened thoughts in Mendelson if he had been called again. Furthermore, testimony received after the "Peltzer inquiry" from other ONI agents revealed that, in June or July, when Mendelson was transferred to Norfolk, he delivered four boxes of tapes (without a rubber band) to Agent Carroll, who testified that Mendelson had stated "they were the tapes of Commander Augenblick's

\* \* \* interrogation." The four boxes were subsequently placed in storage. It thus became more apparent that, while the Hodges tape was in Mendelson's control (as it apparently was), it disappeared since it was not among the four tapes handed to Agent Carroll. It is also evident that two extraneous tapes, not pertinent at all to the Augenblick investigation, were added to the two reels of the accused's interrogation.

Next, during the out-of-court hearing at the second court-martial, it was known that the Hodges tape could not have been reused pursuant to normal ONI procedures. These procedures place the responsibility on the officer in charge of the case (Mendelson) and his superior (Fason), jointly, to decide whether a tape should be reused. But Mendelson, himself, had testified earlier that he did not recall advising Fason that the tape was no longer needed; and Fason said that, after transferring the tapes to Mendelson, he had nothing further to do with them. It would have abridged normal ONI operating practice to have erased the tape, knowing that it might be needed as evidence at a future court-martial. Lastly, Agent James revealed that, even if a tape were erased, the number which he initially affixed to the reel (and also entered in his recording log) would not have been removed. Therefore, even if the Hodges recording had been erased, the ONI still should have produced, and been able to produce, the properly numbered reel.

Each of these points raised new and important areas of investigation which could have been pursued if Mendelson had been called as a witness at the out-of-court inquiry during the second court-martial. It was evident, we stress, from his earlier testimony that Mendelson was not a witness whose prior statements could be accepted at face value. Other testimony indicated, also, that he was best positioned to inform the court of the disposition of the tape-recording. It had been directly traced into his hands by the evidence of James and Fason. As the agent who apparently had physical control of the tape during the period in which it disappeared, his testimony was very important to the Government in meeting its burden of good-faith destruction or loss. See United States v. Annunziato, 293 F.2d 373, 381 (C.A.2, 1961), cert. denied, 368 U.S. 919, 82 S. Ct. 240, 7 L.Ed.2d 134; Alexander v. United States, 118 U.S.App.D.C. 406, 336 F.2d 910, 912 (1964), cert. denied, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 346; United States v. Hilbrich, supra, 232 F. Supp. at 130.[14] We must therefore agree with the dissenting member of the Board of Review that failure to recall Mendelson for testimony bearing on these most important issues was error which substantially prejudiced the accused's rights.

**IV**

■ The plaintiff also argues that the law officer erred in not making an *in camera* examination of Mendelson's handwritten notes of the Hodges early-morning interrogation at the Naval Weapons Plant. Under the Jencks statute, the Government is required to produce only those written statements of a witness which are a "substantially verbatim recital" of the witness' oral statement. See footnote 9, supra. For the

14. One military tribunal appears to have held the prosecution to perhaps an even more stringent standard of conduct than the civilian courts. In United States v. Combs, 28 C.M.R. 866 (1959), Government negligence, rather than " 'conscious' destruction", resulted in the loss of a Jencks Act statement requested by defense counsel. The Air Force Board of Review held that "we cannot allow the intent of that law [Jencks statute] to be circumvented by such negligence." Acknowledging that both the *Jencks* decision and statute were "aimed at preserving and perfecting the accused's rights to cross examination of prosecution witnesses on the basis of certain prior statements \* \* \*", the Board imposed a duty upon the Government to preserve any statements until, at least, after it has been determined whether their production will be required at trial. Id. at 873. In *Campbell I*, supra, 365 U.S. at 98, 81 S.Ct. 421, the Supreme Court left open the question of destruction or loss which was in good faith but merely negligent.

notes to qualify as a statement, the court must ask whether they "could fairly be deemed to reflect fully and without distortion what had been said to the government agent." "[O]nly those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment." Palermo v. United States, supra, 360 U.S. at 352–353, 79 S.Ct. at 1224.

■■■ When an accused seeks production of a paper said to be a "statement", the trial judge, or law officer at a court-martial, must once again exercise his affirmative duty in discharging his responsibilities under the Act. Campbell v. United States, supra, 365 U.S. at 95, 81 S.Ct. 421. The entire Court in Campbell recognized this duty when "the legal significance of a document" is at issue. "Here the responsibility for resolving the issue rests with the court, and it is the court that must pursue appropriate means for ascertaining the facts relevant to judgment." Id. at 107, 81 S.Ct. at 433. The primary obligation is placed upon the court.

■■■ The "appropriate means" can vary with each case. Documents "clearly beyond the reach of the statute" perhaps need not be produced. "However, when it is doubtful whether the production of a particular statement is compelled by the statute," the Government, at a minimum, must submit the statement to the trial judge for an in camera determination. Palermo v. United States, supra, 360 U.S. at 354, 79 S.Ct. at 1225. Often, the circumstances require a voir dire inquiry at which the judge takes testimony and hears argument of counsel relating to the statement. Campbell v. United States, supra, 365 U.S. at 92, 81 S.Ct. 421; Palermo v.

United States, supra, 360 U.S. at 354–355, 79 S.Ct. 1217.

While the decisions of other courts in other factual circumstances cannot serve as binding precedent to resolve the particular issue we have, it is relevant that the courts have been very reluctant to decide whether a document qualifies as a statement without, at least, holding an in camera examination of the document. Palermo, itself, concluded that an agent's notes, consisting of approximately 600 words, of a conference lasting three and one-half hours was not a Jencks Act "statement" only after the disputed notes were examined by the trial judge. See, e. g., United States v. Keig, 320 F.2d 634, 637 (C.A. 7, 1963); Karp v. United States, 277 F. 2d 843, 849 (C.A.8, 1960), cert. denied, 364 U.S. 842, 81 S.Ct. 80, 15 L.Ed.2d 65; Williams v. United States, 117 U.S.App. D.C. 206, 328 F.2d 178, 180 (1963); Bary v. United States, 292 F.2d 53, 58 (C.A.10, 1961). These and companion decisions, to paraphrase Justice Frankfurter, seem to us to establish "a generally clear direction" that, where there is doubt, in camera inspection must be had. Palermo v. United States, supra, 360 U.S. at 353,[15] 79 S.Ct. 1217.

■■■ The law officer and the Board of Review did not find that there was no doubt that Mendelson's handwritten notes were not producible; they simply determined, without looking at the notes, that for various reasons they must be considered non-producible. But in the absence of the notes it could not be said, without much doubt and hesitation, that they failed to qualify as a "statement." In denying the accused's motion for production of the notes, the law officer relied "particularly" on the fact that the agent used "navy terminology." Agent

15. In only one decision which has come to our attention has a circuit court affirmed the trial judge's refusal to hold an *in camera* examination of a memorandum to determine its status under the Jencks Act, Canaday v. United States, 354 F.2d 849, 859 (C.A.8, 1966). That court

stressed the Government agent's undisputed testimony that the memorandum was drafted from information contained in documents which were given to the defense, and that no prejudice resulted from the judge's action.

Mendelson's testimony at the "Peltzer investigation", however, reveals that such jargon was included in a typed memo report subsequently prepared, but apparently not in the notes. The law officer seems to have confused the notes with the typed memorandum subsequently prepared by the agent. Furthermore, the initial evidence concerning the notes was only Mendelson's comment that "I did jot down a couple of rough notes at the time." Subsequently, Mendelson informed the trial counsel that "he never had any" notes of the Hodges interrogation. Once again, Agent Mendelson's initial statement became engulfed in a shroud of mystery and doubt, solely of his own creation. In addition, the Board of Review rested in part on its factually erroneous statement (twice repeated) that accused's counsel did not ask for the notes at the pre-trial proceedings.

In these circumstances, we think it was erroneous for the Board to affirm the law officer's failure to examine *in camera* Mendelson's notes of the Hodges interrogation so as to determine if they qualified as a "statement" and were producible under the Jencks Act. Such an *in camera* judicial examination would accord with the Act's purpose to regulate the defense's access to government papers. Palermo v. United States, supra, 360 U.S. at 354, 79 S.Ct. 1217. The *mere examination would not have delayed the trial or caused excessive inconvenience.* United States v. Comulada, 340 F.2d 449, 451 (C.A.2, 1965), cert. denied, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272. It would have assured, however, that the accused's right to important material was adequately safeguarded.[16]

For these reasons (Part III and IV, supra), we hold that the plaintiff's court-martial was tainted with two separate violations of the Jencks Act. In so ruling we are not reweighing and reexamining the evidence for ourselves (see Burns v. Wilson, supra, 346 U.S. at 144,

73 S.Ct. 1045, 97 L.Ed. 1508) but are determining that the law officer and the Board of Review committed serious legal errors—placing the burden of persuasion on the accused and otherwise misinterpreting the requirements of the Act—which deprived plaintiff of the "fair consideration" and the "full and fair hearing" which were his prerogatives (id. at 142, 144, 73 S.Ct. 1045). The question remains whether these legal errors so prejudiced his trial that we should conclude that his constitutional right to due process has been violated.

V

■■■■ Every violation of the protections afforded by the Jencks Act does not, in and of itself, amount *ipso facto* to a violation of the Due Process Clause. See Scales v. United States, 367 U.S. 203, 257–258, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). The Act's requirements, for instance, have not been applied as such to state criminal convictions. But we must explore the special circumstances of the case to determine if the statutory violations so fatally infected the court-martial proceedings against plaintiff that he was unconstitutionally deprived of a fair trial. That can surely be the result of significant procedural errors like these. The Supreme Court has indicated that the demands of the Due Process Clause must be carefully weighed when an accused in a criminal trial seeks evidence within the prosecution's control which is important to his defense. See Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Reynolds, 345 U.S. 1, 6, 73 S.Ct. 528, 97 L.Ed. 727 (1953); United States ex rel. Touhy v. Ragen, 340 U.S. 462, 469, 71 S.Ct. 416, 95 L.Ed. 417 (1951). This constitutional inquiry is integral to our system under which the Government which prosecutes an accused also shares the responsibility of assuring that justice is done. Jencks v. United States, supra, 353 U.S. at 671, 77 S.Ct. 1007, 1 L.Ed.2d 1103.

---

16. If the notes were not produced, the law officer could have inquired whether they had ever been made and, if so, had been improperly destroyed or lost. See Camp-bell v. United States, supra, 365 U.S. at 94, 98, 81 S.Ct. 421; Ogden v. United States, supra, 303 F.2d at 733 (C.A.9, 1962).

The *Jencks* decision recognized that "justice requires" that a defendant at a criminal trial obtain prior statements of a witness which relate to his testimony. Id. at 669, 77 S.Ct. 1007. Discussing the basis of the Court's decision, Mr. Justice Brennan has said: "It is true that our holding in *Jencks* was not put on constitutional grounds, for it did not have to be; but it would be idle to say that the commands of the Constitution were not close to the surface of the decision; indeed, the Congress recognized its constitutional overtones in the debates on the [Jencks] statute." Palermo v. United States, supra, 360 U.S. at 362–363, 79 S.Ct. at 1230 (concurring opinion). A sponsor of the Jencks legislation explained, "The purpose of the bill is to protect the files of the Government against unwarranted disclosure and at the same time to preserve due process of law for defendants in criminal cases." 103 Cong.Rec. 16487 (Sen. O'Mahoney); Clancy v. United States, 365 U.S. 312, 315, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); Campbell v. United States, supra, 365 U.S. at 92, 81 S.Ct. 421, 5 L.Ed.2d 428. See also Communist Party of U. S. v. Subversive Activities Control Board, 102 U.S.App.D.C. 395, 254 F.2d 314, 327, 328 (1958); 103 Cong.Rec. 15933–34, 15928, 16488–89, 16738 (1957).

A combination of factors leads us to conclude that, in this case, the Jencks Act violations were so weighty that they cumulated to the denial of a minimally fair trial. The first is that Hodges was the all-important prosecution witness. Without his testimony it seems unlikely that the court-martial would have convicted, even of the lesser offense. If the tape-recording had been improperly lost or destroyed, his entire testimony would have been stricken (under 18 U.S.C. § 3500(d)) and the prosecution would have been left with little. Yet the evidence available to the law officer indicated a good chance that the tape, traced to Mendelson, had been improperly destroyed or lost by him. It was therefore critical to the trial that the tribunal go as far as could be to inquire into that possibility.

If the recording had been produced as a result of further examination of Mendelson, the information it contained could have been most revealing. Hodges was twenty years old and a low-ranking enlisted man. At first he denied that "anything happened." What he said thereafter at his first interrogation in the early morning at the Naval Weapons Plant, what questions he answered, how he was interrogated, would clearly have a significant bearing on the reliability of the statement thereafter written up at Air Force headquarters and on the credibility of his testimony at the trial. The dissenting member of the Board of Review detailed the importance to the accused of this "initial interview of Hodges, a twenty year old, frightened enlisted man, being interviewed by two agents, with a third monitoring, in the early hours of the morning, especially since there are some indications in the record that at the very outset Hodges denied that 'anything' happened." Since Hodges during the trial apparently expected to receive an honorable discharge, and subsequent to the plaintiff's conviction was in fact honorably discharged from the Service, it was also very relevant for the accused to ascertain whether any inducement was offered or suggested, or other improper dealings had, during this first interrogation session.

Moreover, Hodges must have been a very dubious witness. His veracity was obviously questioned by the members of the court-martial. Of the prosecution's three principal witnesses, only Hodges testified that the accused had committed an act of oral sodomy. Significantly, plaintiff was acquitted of the charge of sodomy, and convicted only of committing an indecent, lewd, and lascivious act (wilfully and knowingly placing his head in the airman's lap with his face in close proximity to the latter's exposed privates). The testimony of the civilian police officers, that they had observed the accused's head in the vicinity of Hodges' exposed privates, is not necessarily inconsistent with the accused's defense that he was very sleepy and fell asleep. There

was testimony that Augenblick was prone to cat-naps. Obviously, statements made at the Naval Weapons Plant interrogation could have been of great significance in the cross-examination of Hodges.

The content of this first interrogation assumes even greater importance given the nature of the accusation and the background of the accused. Like other sex crimes, the accusation here, the heinous crime of sodomy, is not difficult to utter but arduous to defend against. It is not unknown for such charges to be concocted by frightened, psychologically disturbed, perverted, or greedy individuals. Testimony revealed that, so far as was known, this accused never previously acted in the manner charged and has been and continues to be held in the highest esteem by his fellow officers. But such evidence can be insufficient in the face of direct and explicit accusations of unnatural conduct. It is here that knowledge of the early morning interrogation of Hodges could have been specially important to the defense in the court-martial. Cf. Kyle v. United States, 297 F.2d 507, 512 (C.A.2, 1961). It is no matter that the information would bear on the main witness' credibility rather than directly on the accused's guilt. Indeed, the court-martial panel's "estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence * * *." Napue v. People of State of Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (Feb. 20, 1967); People v. Savvides, 1 N.Y.2d 554, 557, 154 N.Y.S. 2d 885, 887, 136 N.E.2d 853, 854–855 (1956).[17]

If the accused were able to discover what had transpired at the interrogation through other means, the prejudicial effect of the Jencks Act violations would have been lessened. See Rosenberg v. United States, 360 U.S. 367, 370–371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). The defense did have the opportunity to question Hodges on the interrogation. This, however, could not serve as an adequate substitute for being able to ascertain what the witness had actually said (and what was said to him by the inquiring officers) shortly after his arrest. Plainly, the effectiveness of the trial cross-examination was curtailed by the defense's inability to gain access to the witness' prior statements. Nor was Hodges' five-page statement prepared later at Air Force (OSI) headquarters in Suitland, Maryland, a sufficient replacement. That paper, written in the presence and with the assistance of an OSI agent, was compiled several hours after the initial interrogation. It did not shed any light on the conduct or statements of the participants at the earlier Naval Weapons Plant interrogation.

Of course, it may have been that the tape-recording or Mendelson's notes would not have proved helpful to the accused, or that they may have been shown (if Mendelson had been called to testify) to have been lost or destroyed in good faith and without fault, or that they may have been proved never to have existed at all, or that the notes would turn out not to be producible under the Jencks Act. But, in view of the critical importance of Hodges' testimony and of his interrogation at the naval station, plaintiff was strongly entitled to have these matters pursued and judged with the burden of proving good faith resting on the Government and with proper action by the trial judge to obtain and evaluate the materials. In the absence of satisfactory alternative means of discovery, the legal errors committed by the law officer and the Board of Review deprived the accused of rights which were extremely valuable to him—of cardinal moment in this case. He was denied a necessary step toward obtaining, or discovering the status of, materials of first-rank for his defense. In our view, this denial, in the circumstances, seriously

---

17. These comments are all applicable, with lesser force, to Mendelson's hand-written notes (if they proved to be producible).

impeded his right to a fair trial in violation of the Due Process Clause of the Constitution.

Since his conviction and dismissal were thus invalid, plaintiff is entitled to recover back pay and allowances, less appropriate offsets, from the date on which the pay and allowances were withheld to the date of judgment. The plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. Judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c).

Smith, J., dissented.